# Braddee *against* Brownfield.

## Same *against* Same.

An Act of Assembly directing a judgment to be opened and the defendant let into a defence upon the plea of payment, is the exercise of a jurisdiction of a remedial character, partly legislative and partly judicial, and not in violation of the constitution.

Legislative and judicial powers sometimes so commingle, that the exercise of a certain kind of judicial authority in the passage of a law is in accordance with precedents, and not contrary to received constitutional principles, nor such as a court could annul.

The acknowledgment of a sheriff's deed is not such a *res adjudicata* as precludes an inquiry into the legality of the proceedings by which the sale was made.

A writ of error does not lie to the Court of Common Pleas upon its refusal to open a judgment, or in its receiving the acknowledgment of a sheriff's deed.

ERROR to the Special Court of *Fayette* county.

John F. Braddee against Bazil Brownfield.

The facts of this case, and the principles of law raised by them, are fully stated by the court below, in their charge to the jury, which was the subject of exception.

GREER, President.—The case before us originated in a proceeding before two justices of the peace, under the " Act (of 6th April 1802) to enable purchasers at sheriff's and coroner's sales to obtain possession."

Dr Braddee, the plaintiff, had purchased the land in dispute at sheriff's sale, as the property of Joseph Collins; Bazil Brownfield, the defendant, being in possession of a part of the premises, (about 200 acres). The plaintiff instituted these proceedings against him to obtain the possession. The jury having found the facts necessary to entitle the plaintiff to possession, the defendant " *made oath,*" according to the provisions of the Act of Assembly, that he claimed the property by a purchase from Joseph Collins, previous to the time of the plaintiff's judgment, and the proceed-

ings were removed to the Court of Common Pleas; and this is the issue now to be tried; whether Dr Braddee is entitled to the possession of the premises in dispute.

On a former trial of this case before this court, the defendant offered in evidence his sheriff's deed for the plaintiff's interest in this property, obtained since his appeal; and it was rejected, on the authority of the case of *Hale* v. *Henrie,* (2 *Watts* 147), and the defendant was confined in his defence to the claim set forth in his affidavit. The plaintiff recovered a verdict, and the defendant took a writ of error to the Supreme Court. From the decision of that court reversing the cause, it appears that this court *erred* in relying upon the case of *Hale* v. *Henrie.* We have, therefore, on this occasion, admitted the deed we then rejected, and in consequence thereof, we have to try an entirely different issue from that which was presented at the former trial, as the defendant has wholly abandoned the defence and title set up as the ground of his appeal. By so doing, he admits the plaintiff had a right to recover when he instituted the proceedings, and therefore has a right to a judgment for costs and damages up to the time his title was devested by the sheriff's sale. The only question, then, to be decided at this time, is the validity of this sheriff's sale of plaintiff's title to the defendant.

The foundation on which this sale rests, were four certain judgments entered to June Term 1834, in the Common Pleas of this county, Nos. 47, 48, 49, and 50, on bonds with warrants of attorney, given by John F. Braddee to Bazil Brownfield. The almost interminable litigation between these parties, originating in the entry of these judgments, which has nearly monopolized the attention of both the civil and criminal tribunals of the county from that day to this, is a portion of the history of your county, known to all its citizens, and unnecessary to be adverted to by the court. But in order to understand the nature of the objections to the validity of this deed, it will be necessary to state some of the judicial and legislative history of the case, so far as they are in evidence before us; and without at all wishing to reflect upon the conduct or proceedings of any tribunal which has had, or assumed to have jurisdiction on this subject, I may say, that the case presents a most anomalous and unprecedented course both of judicial and legislative action.

It appears that soon after these judgments were entered, an application was made by Braddee to the court, to open the judgments and let him in to a defence, on the ground that the bonds had been fully paid and satisfied. Why the court refused to grant this application, which was urged, continued and renewed from time to time for two or three years, especially when several witnesses swore positively to the payment of money and the signing of a receipt, it is unnecessary to inquire; suffice to say, the application *was refused* by the court, and the defendant, Braddee, had

[Braddee v. Brownfield.]

recourse to the legislature. Producing his receipt in full for the money, proved by two subscribing witnesses, and complaining that the court had refused him his constitutional right of a trial by jury, he prevailed on the legislature to pass the Act which you have heard read, (Act of 1st of April 1837, Pamphlet Laws 128). By this Act, the Court of Common Pleas of this county are enjoined " *to order said judgments to be opened and direct an issue* to try the alleged fact of payment before a jury of said county, in the same manner that causes are at law triable," &c.

It further directs, " That all orders or precepts of the court shall be stayed until the question of payment be determined by a jury, and all sales, *should any be made on the said judgments of the real or personal estate of the said defendant, shall be* VOID until the facts alleged in the said petition of said defendant shall be tried by a jury as aforesaid," &c. It was also further enacted that " should the judges of the Court of Common Pleas of Fayette county *decline* or *refuse* to try the issue aforesaid, the *District Judge of the city of Pittsburgh*, in the county of Allegheny, be and he hereby is authorized and empowered to hold a special court at Uniontown, in the county aforesaid, at such time as said judge may order and appoint," &c.

After the passage of this Act, Braddee again applied to the Court of Common Pleas of this county " to order the judgments to be opened and direct an issue," as required by the Act of the legislature. That court " declined and refused," not only " to try the issue," but refused obedience to the Act as far as "to open the judgments or direct an issue." On a certificate of this refusal, the president judge of the District Court of Allegheny county, assuming himself to be the person intended by the description of *District Judge of the city of Pittsburgh*, &c., appointed a special court at this place on the second Monday of August 1837. Presuming also that the legislature meant *something*, notwithstanding their costiveness of diction, and perplexed obscurity of expression, that special court when constituted, *assumed* jurisdiction of *these cases*, and although there was no *issue* as yet directed, they assumed the power to direct one and try it; and after an impartial investigation and a full and fair hearing of the parties, the jury found that the judgments had not been paid.

It must be recollected, also, that previous to the passage of this Act of Assembly, the property of Braddee had been levied on and condemned, and an *alias venditioni exponas* to June Term 1837, had been issued some two weeks before the passage of the Act. Notwithstanding notice of the passage of this Act was given to the plaintiff and his counsel, and the sheriff, the property was exposed to sale at the June court and knocked down to the plaintiff in the judgments, Brownfield (or his agent). On the 5th of July following, the counsel of Braddee " moved the court for a rule to show cause why the sale should not be set aside, on the

ground that the legislature had ordered the proceedings to be stayed. The court refused to entertain the motion, for the reasons before stated," when they refused to open the judgment, to wit: that the Act of the legislature was unconstitutional, and the case removed to another tribunal if it was not. On the 25th of August 1837, Braddee's counsel moved *in the Special Court* then in session trying the issue, " to set aside the sale on the ground that it was made since the passage of the law, and in violation of it." To this motion the court answered, that the motion could not be entertained, as they had no power except to try the *issue of payment.* On the 12th of September 1837, before the acknowledgment of the sheriff's deed, John F. Braddee again petitioned the Court of Common Pleas, setting forth " the Act of Assembly, the executions and sale, the trial of the issue by the special court, and their refusal to entertain jurisdiction of the question about the sale, &c., and therefore praying the court to set aside the sale as made contrary to the Act of Assembly, and for a sum less than one-sixth of the value of the land." On this petition is the following endorsement: " Sept. 12, refused." On the 16th of September the sheriff's deed to Brownfield was regularly acknowledged.

The only question then before us is the validity of this deed—and this is a question of law for the court, depending upon records and Acts of Assembly.

The plaintiff's counsel have requested us to instruct the jury:

1. That the law passed the 1st day of April 1837, is a constitutional law.

2. That from and after the passage of the Act of the 1st of April 1837, the judgments were opened by the operation of that law, and therefore an execution and sale predicated on these judgments, were void and conveyed no title.

3. That by the law aforesaid, all orders and precepts (executions) of the Court of Common Pleas were stayed until the question of payment should be determined by a jury; and inasmuch as a sale was made after the passage of the law and before there was a trial by jury, the sale was absolutely void, and the purchaser, Bazil Brownfield, took no title by the sheriff's deed.

4. That ejectment, or the form of suit adopted by the plaintiff in this case, under all the circumstances of the case, and from the facts disclosed and evidence given, is the proper and legitimate mode of inquiry into the legality and fairness of the sale, and the validity of the sheriff's deed to Bazil Brownfield. And this court and jury are not precluded from that inquiry, by the fact that the deed was acknowledged in a court, after the rule to show cause why the sale should not be set aside.

5th. That if the jury believe that Bazil Brownfield was made acquainted with the law of 1st of April 1837, and in violation of it, on a levy subject to the claim which the plaintiff has in the same, which the plaintiff alleges is 200 acres, and whilst this very

[Braddee v. Brownfield.]

suit was pending, proceeded to sale, sold the property at a great sacrifice, and became the purchaser, it is a legal fraud, and inquirable into in ejectment.

Without giving a particular answer to each of these points, in the order in which they stand, the court will briefly state their reasons for coming to a contrary conclusion on the whole facts of the case, and refusing to charge the jury as therein requested.

In the decision of this case, I do not think it material to decide whether the Act of Assembly referred to is constitutional or not. The constitutionality of Acts of the legislature is a question for the *Supreme Court alone*, and we shall take it for granted in this case (whatever our private opinions may be) that the Act is constitutional; nor shall we inquire into the construction of the eleventh section; or endeavour to elaborate the meaning of the legislature, out of the profound obscurity in which their diction has involved it, or pretend to decide what construction will render it least liable to the charge of absurdity.

The Court of Common Pleas had jurisdiction of the subject matter; they had rendered a regular judgment, and awarded an execution; the land in dispute was levied on and condemned; a *venditioni exponas* was in the sheriff's hand, ordering him to sell this property when this Act of Assembly passed. Whether the legislature have power to open a judgment, or to order a court to do a judicial act; or whether the special court which opened the judgment had any power so to do, or only assumed it, are questions not necessarily arising in this case. The parties in this case are the same as in the judgments and executions. The Court of Common Pleas, when they acknowledged the deed, had full jurisdiction of the case. That was the proper suit and the proper tribunal to judge of the regularity of the process and sale, and to construe the force and effect of the dark sayings of this 11th section. In this state, the reception of an acknowledgment of a sheriff's deed, is a judicial act, in the nature of a judgment of confirmation of all the acts preceding the sale, curing all defects in process or its execution, which the court has power to act upon. When the acknowledgment is once taken, everything which has been done, is considered as done by the previous order or subsequent sanction of the court, and cannot be afterwards *disaffirmed collaterally.* See *Thompson* v. *Phillips,* (1 *Baldwin* 272). The court which directs a sale, can alone judge of the legality of acts done under its authority. It follows that all questions arising on judicial sales, when their validity is questioned in an ejectment, must be those of authority (or fraud practised by the purchaser), not of irregularity or error in awarding executions, or confirming process or acts in pursuance of it. If the power of the court is once brought into action, no tribunal can declare their proceedings nullities. These principles, laid down by Mr Justice Baldwin in the above case, are the settled

law of Pennsylvania, at least since the case of *M'Pherson* v. *Cunliff*, (11 *Serg. & Rawle* 424). It is useless to accumulate cases: the books are full of them. Nor does it make any difference where the plaintiff is the purchaser. *Arnold* v. *Gorr*, (1 *Rawle* 223); *Hale* v. *Henrie*, (2 *Watts* 147); *Tarbox* v. *Hays*, (6 *Watts* 400). The only exception to be found in late cases to this rule, is where the court has no jurisdiction, or where the purchaser at sheriff's sale has been guilty of "*actual fraud.*" *Gilbert* v. *Hoffman*, (2 *Watts* 66); *M'Kennan* v. *Pry*, (6 *Watts* 137); *Hoffman* v. *Strohecker*, (7 *Watts* 86); *Gibbs* v. *Neely*, (7 *Watts* 305). The case of *Burd* v. *Dansdale*, (2 *Binn.* 80), would hardly be considered law at the present day.

But in this case, this very question as to the regularity of this sale was raised between these parties, and decided by the court, and is therefore "*res judicata;*" and it matters not, that no writ of error would lie to the decision of the court on the subject. It may be a hardship in some cases, but the legislature only can remedy it. The question, therefore, raised by plaintiff's counsel as to the confirmation of the sale by taking credit for the amount of it, does not necessarily arise, nor does the evidence show such an actual confirmation as would validate the sale, if it could be declared void for other reasons. Whether, therefore, the Court of Common Pleas did right in confirming this sale, under all the circumstances, (considering the effect of the wording of the levy "subject to the claim of Brownfield to 200 acres," and, besides the shade then cast on the title offered for sale, the uncertainty created by this Act of Assembly,) is not a question open for the decision of this court.

The jury are therefore instructed to find for the plaintiff, costs and damages only, and that the title of plaintiff became vested in defendant by the sheriff's deed of the 15th of September 1837. The plaintiff has given no evidence of the amount of damages: I presume, therefore, that question is reserved, that the parties may enjoy the luxury of another lawsuit.

To this charge the plaintiff excepted.

*Austin*, for plaintiff in error, argued, that the Act of Assembly, authorizing the opening of the judgment, was constitutional; and on this point cited 3 *Dall.* 386; *Pamp. Laws* 1832—1833, *page* 107; 2 *Peters* 380; 2 *Penn. Rep.* 503; 4 *Serg. & Rawle* 356; 7 *Peters* 516, 546; 14 *Serg. & Rawle* 435; 1 *Rawle* 323; 7 *Watts* 300; 7 *Peters* 469; 1 *Reg. of Debates* 479, 481, 515; 9 *Watts* 149; 14 *Serg. & Rawle* 127; *Plowd.* 205. The acknowledgment of a sheriff's deed is not conclusive, but the regularity of the sale may be inquired into. 4 *Serg. & Rawle* 82; 4 *Yeates* 341; 2 *Binn.* 80.

*Howell* and *Dunlop, contra.* The *venditioni exponas* was issued before the law passed: and the effect of its passage was, not to take away the jurisdiction of the Common Pleas, but to

[Braddee v. Brownfield.]

create a tribunal to try the issue. The jurisdiction of the Common Pleas remained; and the 11th section of the Act contemplates that it shall continue to be exercised. Assuming the law to be constitutional, the proceedings of the court are conclusive. 1 *Bald.* 271; 2 *Peters* 169; 10 *Peters* 473; 4 *Cran.* 333; 6 *Watts* 401, 492; 1 *Rawle* 226; 2 *Watts* 147; 1 *Serg. & Rawle* 101; 1 *Yeates* 40; 6 *Binn.* 255; 10 *Watts* 23, 472; 2 *Whart.* 469; 8 *Watts* 194; 1 *Conn.* 1; 17 *Serg. & Rawle* 320.

The opinion of the Court was delivered by

SERGEANT, J.—The great object of the plaintiff in error, Braddee, in his applications to the Court of Common Pleas of Fayette county, and to the legislature after his failure in those applications, was to have the fact of payment of the bonds, on which the judgments against him had been entered, tried by a jury. This he eventually obtained by means of the Act of Assembly of the 1st of April 1837, and when the trial was had, the verdict of the jury decided that the bonds had not been paid. In the meanwhile, the defendant in error, Brownfield, proceeded with his executions on his judgments—sold the tract of land now in question at sheriff's sale, as the property of Braddee, becoming himself the purchaser. The plaintiff in error contends, that the trial of the issue of payment was not the sole purpose of the Act of Assembly: that it went further, and in effect prohibited any proceedings before the trial to sell his property by execution on the judgments, and therefore the sale which took place, and under which Brownfield now claims title, was absolutely null and void to all intents and purposes whatsoever. This is a brief epitome of the matter in contest, and suffices to present the question raised between these parties on which the case turns, what is the true intent and meaning and operation of the Act for the relief of the plaintiff in error, passed on the 1st of April 1837?

The defendant in error contends, that this Act of Assembly, in interfering with the duties of a tribunal of justice, and dictating to them that they should open judgments confessed by bonds and warrants, and allow the plaintiff in error a trial by jury of the fact of payment, prescribing new conditions as to sales under the judgments, after the court had heard the parties, and decided that the judgments ought not to be opened, was in contravention of the constitution of Pennsylvania, and in no way affected his proceedings. It is certainly true that this species of legislation, for particular cases pending in courts of justice, by granting extraordinary privileges to one party or the other, out of the ordinary course of justice, is susceptible of abuse, and may lead to great injustice, and ought to be warily employed by a wise legislature. But for us to hold a law unconstitutional, it must be a plain violation of some provision contained in the constitution. It must be an *ex post facto* law, or a law impairing the obligation of contracts,

or manifestly in collision with some constitutional provision.  The exercise of a certain sort of superior equity jurisdiction of a remedial character, a kind of mixed power, partly legislative, partly judicial, seems to have been practised by our legislature from time to time, in the shape of special laws like that before us.  They have been looked at with jealousy by some, while others have considered them as necessary, under our frame of government, to prevent a total failure of justice in certain cases not falling within the control of the judicial branches.  There is, at any rate, no clause in our constitution which prohibits them; and when a motion to that effect was introduced in the late convention which formed our present constitution, though the subject was much and ably canvassed, and the law now in question commented upon, no alteration was made on the subject.  See *Debates in Convention of* 1837, p. 479, 544, &c.

Under these circumstances, it would be difficult to say that a law, granting a remedy to a party by referring the cause to another decision, or enabling him to sustain an action where he could not before sustain one, or removing an impediment in his way to obtaining a hearing and decision, or conferring powers, or ratifying imperfect acts and doings of officers, by which the rights of a party would otherwise be lost, is a violation of the constitution. Every case of the kind must be judged of by itself, according to its own peculiar circumstances.  That there is a usurpation on the judiciary, which it would be unconstitutional in the legislature to assume, may, I think, be safely asserted.  That, on the other hand, there are cases where the legislative and judicial powers so commingle, that the exercise of a certain kind of judicial authority in the passage of a law is in accordance with precedents, and not contrary to received constitutional principles, nor such as a court could annul, is perhaps equally clear.  In the passage of the present law, the legislature have acted rather in the character of an appellate tribunal of justice, ordering, by way of mandamus, that to be done which they considered ought to be done, and which no existing appellate tribunal could relieve against, by interposing in a special case then depending in court before a competent tribunal, which had already heard and decided between the parties, and giving a remedy in that particular cause alone, without prescribing a general rule for the conduct of all the citizens of the commonwealth.

It is unnecessary, however, to pursue this subject further; because we are of opinion that, according to the proper construction of this obscure and ambiguous Act of Assembly, the sale of the lands by executions on the judgments after the passage of the Act, was not absolutely prohibited by the Act, but, on the contrary, was permitted under certain terms and conditions; or, in other words, that its enactment is, that if sales should take place,

[Braddee v. Brownfield.]

they should, in a certain event, be voidable, but not absolutely null and void to all intents and purposes whatsoever.

If the Act had contained only the provisions of the 10th section and the first part of the 11th section, down to the proviso, the conclusion might well be drawn, that all sales by execution were to be postponed until after the hearing and determination of the issue ordered by the Act, notwithstanding, in the preamble, the *gravamen* of Braddee's complaint is recited to be, that he had paid and satisfied the judgments in full, and the court had refused to open them; and that the facts set forth by the defendant, were such as could only be determined by a jury. But then comes the last clause of the 11th section, which provides, that if the jury find otherwise, (that is to say, that the bonds were not paid,) " the said sales to remain in full force and effect." What sales are here referred to? By the settled principles in relation to Statutes, unless some other period be prescribed by the Statute from which it is to operate, it speaks from the time of its passage; its enactments are to operate *in futuro*, and are not to have a retrospect beyond the time of its commencement. The rule and law of Parliament is, that *nova constitutio futuris formam debet imponere, non præteritis.* And this is not only the doctrine of the English law, but is also founded in the principles of general jurisprudence. *Dwarr. on Stat.* 680; 6 *Bac. Ab.* 370. The sales referred to, therefore, cannot, as is argued for the plaintiff in error, refer to such as might have happened to take place before the passage of the Act. For although the *alias venditioni exponas* had then issued, yet there is no pretence that any sale was had; nor is there an allusion in the preamble or Act, to a sale being in contemplation. The sales must necessarily be considered as those which should happen after the 1st of April 1837, and not before.

Taking into view, then, the whole tenor and scope of the Act, the legislature orders that the judgments be opened, that the plaintiff's allegation of payment of the bonds shall be tried by a jury, and the rights of the parties be settled according to the event. If the plaintiff should choose to go on and sell, it was to be at the risk of having the whole sale set aside, in case he failed on the trial. On the other hand, the defendant was indulged with another trial, on the merits, before a jury, which was the main object of his complaint and application—with the power, if he succeeded, of treating any sales that might, in the meanwhile, take place, as a nullity. In opening a judgment, the legislature, like a court, may prescribe such terms and conditions as it sees fit. Opening a judgment, is not setting it aside, annulling, or reversing it. It is but a mode of allowing to the defendant a hearing on the merits, and a court may impose such terms as it deems proper. The legislature, acting as a high and responsible tribunal, in a delicate matter, where they were about to interfere in a particular suit, a measure which is looked on with distrust

[Braddee v. Brownfield.]

in a community of laws, might choose to go to a certain extent, and no further. They might choose to say, we will provide you a hearing, but we will do nothing further to delay or hinder the security of the creditor. We will not take away his lien—we will not arrest his executions, if he chooses to go on and sell, and take the risk of the ultimate result. We think we do as much for you, as in justice and reason you can ask, when we allow you to go before a jury to prove your payment, and when we guarantee you from loss of your property, in case you establish your assertion of payment. But we will not tie the hands of your creditor in the meanwhile, when perhaps your assertion is unfounded, and when the fluctuations in the value of property, or the casualties of human affairs, may operate to impair his security, if we do. Such appears to us to be the proper construction of the Act of Assembly, 1st of April 1837, considering all its different provisions, and the existing state of things apparent from the evidence. And it may be further observed, that, where a Statute of this kind is dark in its meaning, and ambiguous in its expressions, it ought not, in our opinion, to be strained farther, in derogation of the ordinary rights of a party to a suit, than is plainly warranted by its enactments. It is rather in the nature of a private Act of Assembly, conferring new and unusual privileges on a particular individual, and should receive a strict interpretation. *Dwarr. Stat.* 750; *Cowp.* 26; 4 *Bing.* 450; 2 *Chitt.* 610, 650. As to the word *void* used in the Act, in this as in many other cases that have occurred in the construction of statutes, when the language and meaning of the whole Act necessarily require it, it means voidable only. *Prigg* v. *Adams*, (*Salk.* 678); *Winchcombe* v. *Winchester*, (*Hob.* 166); *Dwarr. Stat.* 741.

Although, therefore, the court below, agreeably to the principles settled in *Cash* v. *Tozer*, (1 *Watts & Serg.* 519), erred in holding that the acknowledgment of the sheriff's deed to the defendant Brownfield was conclusive and prevented an inquiry in this suit into the validity of the process and sale, yet the verdict and judgment were, for the reasons above given, correct, the sale not being prohibited by the Act of Assembly in the events that have taken place. Nor are the other circumstances referred to in the charge, of the manner in which the levy was made, (subject to the claim of Brownfield to 200 acres,) or the shade cast on the title, sufficient grounds for invalidating the sheriff's deed.

Judgment affirmed.

The other case is also affirmed, being of opinion that no writ of error lies to this court from the Court of Common Pleas, on its refusal to open a judgment, or in receiving the acknowledgment of a sheriff's deed.

Judgment affirmed.

[Braddee v. Brownfield.]

HUSTON, J., *dissenting*.—This was an ejectment for a tract of land in Fayette county. To understand so much of the case as is referred to in the following opinion, I must state some of the facts out of which the dispute arose.

Of April Term 1834, four judgments were entered on bonds with warrant of attorney to confess judgment, all at the suit of Bazil Brownfield against Dr John Braddee, amounting together to upwards of $7000. On one of these judgments a *fieri facias* issued to June Term 1834. On motion and affidavit, a rule was given at June Term, and enlarged till September Term, to show cause why these judgments should not be opened. This application was renewed at every, or almost every court, and in different forms, for two or three years. Two or more witnesses swore positively to the payment of the money and signing a receipt by Brownfield. The court, however, refused to open the judgments. Braddee offered to lodge the amount in court to abide the event of the trial if the court would open the judgments, and he brought it in; but it was in bank-notes, current in every bank west of the mountains, and offered, when the court would not open the judgment on this, to produce the specie in a few days. This delay was refused him. He was advised by the court, as his counsel stated here, to bring suit against Brownfield, under the Act, for not entering satisfaction on a judgment which was satisfied.

On removing the cause to the Supreme Court, it was decided that the Act applied to payments made after the judgment entered, and not to a case where the whole debt was paid after date of the bonds, and before judgment confessed on the warrant of attorney. Braddee then applied to the legislature, and, producing his receipt signed by Brownfield, in presence of two witnesses, and proved by their oaths, the Act of 1st April 1837 was passed. In the mean time, Brownfield had issued a *venditioni exponas*, and it was in the sheriff's hands.

The Act, after setting forth that the truth of the facts set forth in the petition and application to the court are such as can only be tried by a jury, enacts, "Sec. 10. That the court aforesaid (the Common Pleas of Fayette county) shall order said judgments to be opened, and direct an issue to try the alleged fact of payment before a jury of said county, in the same manner that causes are at law triable. Provided nevertheless, that the said judgments shall remain liens as security to the said plaintiff for whatever sum should be found due to him, should he recover anything thereon.

"Sec. 11. All orders or precepts of the court aforesaid, shall be stayed until the question of payment aforesaid shall be determined by a jury as aforesaid, and all sales, should any be made on the said judgments, of the real or personal estate of the said defendant, shall be void until the facts alleged in the petition of the said defendant shall be tried by a jury as aforesaid: Provided, that all

II. — 36          Y *

expenses of said sales shall be defrayed by the said defendant; and should the said jury, on the question aforesaid, find for the said defendant, then such sales to be void, and of no effect; but if the said jury should find otherwise, then the said sales to remain in full force and effect.

"Sec. 12. The prothonotary of Fayette county is hereby authorized and directed to make a list of thirty-six reputable citizens of said county, or such other number as may be agreed upon by the parties, from which the parties by themselves or counsel, shall strike one name alternately, beginning with the plaintiff, until there shall be left twelve persons who shall try the issue aforesaid.

"Sec. 13. Should the judges of the Court of Common Pleas of Fayette county decline or refuse to try the issue aforesaid, the District Judge of the city of Pittsburgh, in the county of Allegheny, be and he is hereby authorized and empowered to hold a special court at Uniontown, in the county aforesaid, at such time as the said judge may order and appoint: Provided, that the said court shall be holden on or before the first of January 1838.

After this, Braddee presented a petition setting out the law at large, accompanied by a duly authenticated copy, and praying the court to open the judgment and direct an issue as therein enjoined to do. The entry of record is on the petition of John F. Braddee, (prout the petition, &c). Baird, President, gave his reasons for declining to act, viz:

1. "Because the legislature have left it optional to the judges of this court, by giving jurisdiction to another judge; which, as I conceive, is a clear intimation that the participation of the members of this court, for some reason not explained, is neither expected nor desired.

2. "Because having taken no part in the decisions of this court, which the legislature has undertaken virtually to review, it would be improper for me to interfere." (I have tried in vain to understand the fact or reason of this.)

3. "Because even if the case was certainly thrown upon this court by the unequivocal terms of the law produced, I would not obey a mandatory legislation, presenting to me a particular course of judicial action. The Act does not merely give a *power* or *impose* a duty, but directs *how* a power already inherent shall be exercised in a particular case. The opening of a judgment is a very important judicial action. It is an interference with a right which a party has acquired, to obtain by a legal process a sum of money ascertained to be due, and is placing that right to the contingency of a new examination. This may be proper upon certain facts being established. It is the province of the court to hear the evidence, and decide upon its import and force. The consciences of the judges must be affected before they can, by their agency, set aside a fixed and ascertained claim. This Act of Assembly commands the court to make a particular decision

upon evidence not submitted to it, but to the legislature; or, in other words, to act upon a conclusion formed in the minds of other persons, not from the result of its own judgment upon facts proved. This, I think, is unanswerable. No authority can warrant me, according to my sense of obligation, to do a judicial act, involving a decision upon facts, unless I am free to form my own opinion and decide as these facts may require. As well might I be commanded to charge a jury in certain and prescribed terms in any case, as to determine how I shall decide upon facts not submitted to me but to the Legislature. This is my separate and individual opinion.

"TH. H. BAIRD.

*June* 10, 1837."

"*June* 10, 1837.

"The President Judge having declined taking any part, or meddling with the within, the Associates do likewise decline.

"CHARLES PORTER,
"SAMUEL NIXON."

On the first day of the June court, the counsel of Braddee moved to set aside the sale of Braddee's land, which had been made after the Act aforesaid, and after the Act had been shown to Brownfield and his counsel, and to the sheriff. This the court refused to do, *for the reasons before stated by the court :* then, in the words of Judge Greer, "on a certificate of this refusal, the President Judge of the district of Allegheny, assuming himself to be the person intended by the description of District Judge of the city of Pittsburgh, appointed a special court at this place, (Uniontown) on the second Monday of August 1837. Presuming, also, that the legislature meant something, notwithstanding their costiveness of diction and perplexed obscurity of expression, that special court, when constituted, assumed jurisdiction of these cases, and although there was no issue as yet directed, they assumed the power to direct one and try it, and after a *partial* (I suppose this is an error in the copy, for *impartial*,) investigation, and a full and fair hearing of the parties, the jury found that the judgments had not been paid."

As the Common Pleas had refused to set aside the sale for the reasons before stated, viz., that the law was an infringement of their rights and dignity, and that the cause was out of their court, Braddee, by his counsel, applied to the special court to set aside the sale, because it was made in express contradiction to the plain and express direction that all orders and precepts of the court aforesaid should be stayed until the question of payment shall be determined by a jury. That court, however, decided that they had only power to try the issue. It would not have been any greater assumption of power than they had taken before, to have

acted on this application. Braddee then went again to the Common Pleas, and stating that the special court had decided against his application because the cause was still in the Common Pleas, applied to them to hear his application to set aside the sale; but this was refused, and the deed acknowledged without any hearing of him or his objections.

There are parts of this case on which I shall give an opinion without knowing whether that opinion accords with the other judges or not; as I understand they do not propose to decide whether the Act of Assembly is or is not constitutional. The power of the legislature in this state—what they can or cannot legally do, is not settled. Constitutional objections have been raised to some laws which did not call for a serious answer; and laws have been acted on without objection, to which it is pretty clear no answer could have been given if objection had been made. In this case I do not propose to write an essay which will cover the whole ground. It is safest to confine an opinion to the cause trying.

When I was reading under the late Judge Duncan, we had no book on the laws of this state, but 1 *Dallas's Reports.* I was very anxious, among other things, to learn something of our practice. Thomas Smith, Esq., afterwards a Justice of the Supreme Court, was President Judge in Carlisle. I understood that while justices of the peace presided in the Common Pleas, there had been a difficulty as to opening judgments confessed on warrants of attorney. He established the practice that on an affidavit of the defendant stating a fact or facts, which if true amounted to a defence to the whole or part of the judgment, and concluding that there was a just defence to the whole or part, a rule to show cause why the judgment should not be opened must be granted; and if the facts were proved by a disinterested witness, the judgment must be opened; and no contradicting evidence was to be received, because the court could not decide on disputed facts—for this purpose a jury was absolutely necessary. After I was admitted to the bar, I practised under Judge Rush, Judge Riddle, and Judge Walker; and presided as judge nine years, and never knew of any other doctrine in that district. I had heard of conflicting affidavits in other parts of the state; but heard this again contradicted, and that the judge had only received affidavits to show that one brought as a competent witness, was in fact interested.

I consider the admission of contradictory affidavits in the Common Pleas in this case, as contrary to what had been the established practice throughout the state, but as contrary to the principles of our law. So the legislature thought when they say the truth of the facts in the petition can only be tried by a jury. In my view of the matter, it is not material whether the Act in question was only restoring the law, or made a new provision.

[Braddee v. Brownfield.]

There are high authorities for saying, there is in every government somewhere an absolute and despotic power. *Calder* v. *Bull*, (3 *Dall.* 386); *Story on Const.*; *Livingston* v. *Moore*, (7 *Peters*). The exceptions to this are only such as are expressly specified in the written constitution. In this state, all those matters mentioned in the 9th article of the constitution " are excepted out of the general powers of government, and shall for ever remain inviolate." Subject to this, and only to this, or some provision of the constitution of the United States, the power of the legislature in this state seems not to be limited; I mean their power to enact laws. "The legislative power of this commonwealth shall be vested in a General Assembly, which shall consist of the senate and house of representatives." A limited veto power is given to the governor unless two-thirds of each house agree.

Theorists have said there ought to be a division of all powers of government into executive, legislative, and judicial; and that these ought to be kept separate. To a certain extent this may be true; but it never has been perfectly attained, and I doubt its utility in practice if attainable. It has not yet occurred in this world that an organization of the judiciary of any country has been devised, which did not from various causes require enlargement or alteration. But however this may be, those who framed our constitution either supposed it impossible, or to them impracticable. In the fifth article of our constitution, which in this respect was not altered nor attempted to be altered by the late convention, the names of our courts are designated, but the extent of their respective powers is scarcely attempted to be defined. Several sections of that article suppose alterations possible; and the sixth section, after reciting some powers heretofore used or given, says: " and the legislature shall vest in the said courts (the Supreme Court and Common Pleas) *such other powers to grant relief in equity, as shall be found necessary, and may from time to time enlarge or diminish those powers, or vest them in such other courts as they shall judge proper, for the due administration of justice.*" Now if, instead of recurring to the beau ideal of a perfect separation of the legislative power from the judicial, a recurrence had been made to these plain expressions, it would have been seen that the legislative powers extend to enlarging or limiting, and of course to regulating the powers of the Supreme Court and Common Pleas. They have not in this case tried or decided the cause, but only given power to try it; or only directed that it shall be tried by the court in the ordinary and constitutional mode: the law by the court with power to grant a new trial, if it ought to be granted, and the decision of the court in matters of law revisable on a writ of error. Granting motions to open judgments was originally a power only exercised by chancery, but has long, even where there is a Court of Chancery, been exercised by the courts of common law. It has been decided in

[Braddee v. Brownfield.]

7 *Serg. & Rawle* 207, that a writ of error does not lie to a decision of the Common Pleas, on opening or refusing to open a judgment; hence, we have little in our books on the subject.   In New York, 3 *Johns.* 142, the court award an issue where there are contradictory statements, and stay proceedings until the issue is tried.   2 *Johns. Cases* 260; 9 *Johns.* 80, 253.   Courts possess an equitable jurisdiction over judgments entered on warrants of attorney; and in this state, courts have always had and exercised such power.   It is an abuse of terms to say it is interfering with a right a person has acquired.   You may as well say it is interfering with a right already acquired, to permit a defence to a bond, or to permit a defence in ejectment against a title good on its face.   It is as necessary " to the due administration of justice," to inquire into the fairness of a claim founded on a bond with warrant to confess judgment as on a simple bond; and a judicial system which did not admit of this, would be lamentably defective.   Even if a judgment is obtained on a writ sued out and served, if there has been fraud, courts open it and sometimes reverse it.

I have said, opening a judgment and granting a new trial was originally a power exercised by Courts of Chancery.   They went much further, and granted injunctions after a trial and judgment. Who does not know of the long and acrimonious contest as to the power and right of a Court of Chancery to grant relief against the penalty of a bond not paid till a day after it was due?   This was settled by an Act of Parliament, made expressly to change the law and compel the courts to give judgment, not for the penalty, but the debt and interest; or rather, as it was obstinately construed, to give judgment for the penalty, but issue execution for the debt and interest only.   In process of time, the law courts granted new trials and opened judgments, and from comity Chancery ceased to do so; but it still retains the power to do so, and in proper cases exercises the power where courts of law have refused.   See *Hart* v. *Simpson*, (14 *Johns.*), and the cases cited in the argument and decision of that case.

The power of the legislature to enact that a new trial should be granted in this case, is within the express words and spirit of our constitution; it was not questionable, and ought never to have been questioned.   If the notion that the court is to decide on matters of fact, is at all general, the law ought to have been general, that the facts should in all cases be submitted to a jury.   We have had some dispute as to the meaning of that clause in our constitution which says ",trial by jury shall be as heretofore." Without writing a dissertation on it, I may say, it means that disputed facts shall be tried by a jury.   This court have uniformly reversed a judgment where the court has attempted to decide on facts, or take the decision of them from the jury.

I need not say to any lawyer that one section of a law may be plain and another obscure, or one entirely unexceptionable and

another unconstitutional. I have endeavoured to show the 10th section was strictly within the constitutional power of the legislature. It would, if the court was disposed to treat another branch of the government with respect, have followed, of course, that proceedings would have been stayed until the issue was tried; but the legislature provided for this, and directed in plain terms that all orders and precepts of the court should be stayed until the question of payment aforesaid should be tried by a jury. In any other county, with any other court and counsel and sheriff, this would have been obeyed. The words " all orders and *precepts,*" included every process of every kind. The Common Pleas of Fayette disregarded this, because they held the whole law to be unconstitutional; and they came to this conclusion by mistaking the power of the legislature, their own power and duty, and by mistaking the meaning of a plain law, not trying and deciding the cause, but directing that it should be tried according to the laws and practice of the constitution.

But this 11th section is said to be obscure by the judge who held the special court. I could wish the opinion had been expressed in other terms, if not in respectful terms. I wish he had abstained from contemptuous language. It does no good; it does not the judge who uses such expressions; it is not consistent with the respect which one branch of our government owes, and ought always to show towards the other branches. That laws have been enacted, the meaning of which learned men'have pronounced obscure, is not new. Bacon, Plowden, Coke, and all their successors, have laid down rules for the construction of statutes; but no rules are necessary unless there is some obscurity.

Comyn, Viner, Bacon, and every abridgment and compiler as late as Dwarris, and every judge as late as Tenterden, have laid down or collected such rules. Among the plainest of these rules is, that the evil complained of, and the remedy intended shall be considered; that clauses which appear contradictory shall, if possible, be reconciled or applied to different stages of the transaction. The legislature were informed that the court had repeatedly and finally refused to open this judgment, and to stay execution; that an execution was then in the hands of the sheriff—and after directing that all proceeding should be stayed as above, they say, " and all sales, should any be made on the stayed judgments, of the real or personal estate of the said defendant, shall be void until the facts alleged in the petition of said defendant shall be tried by a jury as aforesaid."

Now, it cannot be supposed that, in the same sentence, the legislature directed twice that all proceedings should be stayed, and yet supposed they would not be stayed, and also provided that a sale, which should be made, might in a certain event be good. The sentence is awkwardly constructed; but to me its meaning was always apparent. Without changing one word or

[Braddee v. Brownfield.]

letter, I read it, " and all sales, should any be made on said judgments of the real or personal estate of defendant until (before) the facts alleged in the petition of the defendant shall be tried by a jury as aforesaid, shall be void." This was making an absolute provision for all sales occurring after the passing of the Act; it met the evil complained of, and stopped future wrong. But it was possible sales might be made before the law was finally passed, and a provision is made for this; for so I understand the following clause—" and should the jury on the question aforesaid, find for the defendant, then such sales to be void and of no effect; but if the said jury shall find otherwise, then the said sales *to* remain in full force and virtue." Certainly this section, taken together, is obscure. We are to judge from the whole. The direction that all proceedings, all sales, shall be stayed, is plain ; but sales might be made before the Act was passed ; if so, these were, if otherwise fair, to abide the event of the trial on the question of payment of the bond. This construction will give effect to the law—any other will make the parts of the section contradictory ; and then, "where a particular thing is distinctly given or limited in the preceding part of a statute, that shall not be taken away or altered by any general words of the same statute. 5 *Bing.* 180; and this more particularly, if the latter clause is obscure or indefinite. 1 *Jones* 26 ; 6 *Rep.* 19 *b ;* 11 *Rep.* 68.

There is another part of this case to which I decidedly object. The judge says, " In this state, the reception of an acknowledgment of a sheriff's deed is a judicial act, in the nature of a judgment of confirmation of the acts preceding the sale, curing all defects in process or its execution, which the court has power to act upon. When the acknowledgment is once taken, *every thing which has been done* is considered as done by the previous order or subsequent sanction of the court, and cannot afterwards be disaffirmed collaterally." This I believe to be contrary to the uniform practice and understanding of the bar and the court, and to the express decision of this court whenever disputed ; and supported only by one case in 1 *Baldwin.* If the matter depended on practice alone, it ought to be conclusive. " It is from decided cases, where the point has been raised and argued, and from *the long-continued practice of the court without objection made,* that we collect the rules of law," says Lord Ellenborough, 15 *East* 226. Lord Eldon says, " An inveterate practice in the law generally stands upon principles founded on justice and convenience." *Buck.* 279. And again, "When the law has been settled by long-continued practice, counsel do not take a right view of their duty, if they seek to disturb that settled course of practice. The settled course forms the law of the land, and the judge is bound to follow that law so settled." 2 *Russell* 19. Lord Coke, in more than one place, cites with approbation, *contemporanea expositio est fortissima in lege.*

In *Wilson* v. *M'Veagh*, (2 *Yeates* 86), it was contended that a purchaser at sheriff's sale could recover on production of the deed duly acknowledged; but decided he must show the judgment and *fieri facias*, inquisition and *vend. ex.* This was before Shippen and Yeates; the first was a lawyer of more than 46 years' standing, and the other of 36. If the doctrine laid down in this case was true, nothing but the deed would have been necessary. The same decision was made by this court. *Weyand* v. *Tipton*, (5 *Serg. & Rawle* 332); *Duncan* v. *Robeson*, (2 *Yeates* 454). A sheriff's sale in 1771; sheriff went out of office, and, on petition, his successor executed a deed; but it was not acknowledged until 1799, which was four years after ejectment: the deed objected to, but admitted. The deed takes effect from its sealing and delivery, not from the acknowledgment; but the defendant may make every objection which could have been made at the return of the writ.

. In the next case, *Moorhead* v. *Pearce*, (2 *Yeates* 456), the sheriff's deed had never been acknowledged, but had been proved by a subscribing witness, and recorded, and the court said the Act of 1705 was only directory; the plaintiff recovered. These cases seem to prove that as a common deed could only be recorded, and copy used if acknowledged or proved before the proper officer, yet could be acknowledged or proved at a trial in court. So a sheriff's deed could only be acknowledged by him in court, but might be authenticated by the common law proof, and took effect from the sealing and delivery; and the court had no idea that any efficacy was given to a sheriff's deed by acknowledgment, more than is given to any other deed by acknowledgment before a judge or justice. It enabled the party to read it in court without objection as to its execution, but left it open to every other objection. The proceeding under the Act of 1802, before two justices to recover possession, is by positive enactment.

It is true, that in *Murphy* v. *M'Cleary*, (3 *Yeates* 405), it was said a sheriff's deed, which had not been acknowledged in court, could not be read, and that an acknowledgment in court before the return-day of the writ of *venditioni exponas* was void—a matter not settled to be law: but it is also said that you could not prove misconduct in the inquisition. That case went off on a nonsuit. There was no opportunity to object to the inquisition. The inquisition was held after the April Term, and it was sold on the 14th of May, on a *venditioni exponas*, which the jury would have found, issued on the 13th of May, returnable to August Term, and deed was acknowledged on the 15th of May. Cases which are covered with fraud so palpable that the plaintiff abandons them, are not often much considered. On a second trial, the plaintiff abandoned his cause before the defendant had given any evidence.

In *Porter* v. *Neelan*, (4 *Yeates* 108), the plaintiff claimed under

a sheriff's deed. No objection is made as to the acknowledgment, but the court decided the sale void, because no *venditioni exponas* issued. In 4 *Yeates* 212, a sale by sheriff was held invalid, because no *venditioni exponas* issued until the day of sale, and the sheriff's deed was acknowledged at an adjourned court before the return-day of the *venditioni exponas*.

In 4 *Yeates* 341, a sheriff's sale and deed acknowledged in open court. A rule was afterwards obtained to show cause why this sale should not be set aside. On argument, the sale was ratified and confirmed. Other creditors levied on and sold the property again. The first purchaser brought ejectment; the second purchaser offered to show fraud in the first sale. The acknowledgment of the deed by sheriff, and confirmation of the sale by the Common Pleas, were alleged to be conclusive. The court admitted the judgment of a court on some questions was conclusive, but said it did not apply. "The Common Pleas decided that the sheriff's deed should be acknowledged. That gave it no greater validity than if acknowledged without opposition. In which case such sales have been frequently impeached, and have always been held to rest on their own fairness and merits." It was proved a fraudulent claim by an adverse party was used to get the land at an undervalue; and a verdict against the first purchaser in twenty minutes.

I shall not go through all the cases in which purchasers at sheriff's sale have had the fairness and legality of the sale tried in ejectment; but notice some in which the matter has been discussed and decided on. In 4 *Binn.* 61, we find *Heller* v. *Jones.* George Miller had sold a tract of land to Heller and given a deed with warranty. A man called Mounce Jones had a claim to it. Jones had confessed a judgment to N. Jones, who issued a *scire facias* to continue the lien and show cause why execution should not issue. This was served on M. Jones and Heller, neither of whom appeared, but Miller appeared and pleaded, and gave notice of special matter, viz., that the judgment was given without consideration and fraudulent. At the trial neither Miller nor Heller appeared, nor did their counsel take any part, and there was verdict and judgment for N. Jones, who took out execution, and in due form sold the land on which Heller lived and purchased it, and brought ejectment. Miller was made co-defendant on his own application. The land was valuable, and able counsel. It was never alleged by court or counsel that the sheriff's deed, duly acknowledged, concluded the inquiry; but Tilghman and Yeates decided that Miller and Heller were to be considered as one, and the appearance and pleas to the *scire facias*, and judgment thereon, concluded them from showing anything which might have been, though it was not shown in the *scire facias* suit. Brackenridge would have admitted it in the ejectment.

In *Nace* v. *Hollenback*, (1 *Serg. & Rawle* 540), the same point

[Braddee v. Brownfield.]

came up, and it is decided in the same way; but it is expressly said, that if Nace had not appeared and pleaded to the *scire facias* on the mortgage on which his land was sold, he might have proved what he offered, viz., fraud, &c., in the plaintiff purchaser. In *Field* v. *Earle,* (4 *Serg. & Rawle* 82), a sheriff's deed was offered for acknowledgment, and objected to on the ground of fraud in the plaintiff purchaser. The court admitted the deed expressly for the purpose of enabling the purchaser to bring ejectment, so that the question of fraud might be tried by a jury, who alone could decide on disputed facts, or infer fraud from facts.

In *Riddle* v. *Murphy,* (7 *Serg. & Rawle* 230), it was decided that in ejectment by the heirs of the defendant, whose land had been sold by the sheriff, they might recover on proving fraud in the judgment or in the sale. In *Gilbert* v. *Hoffman,* (2 *Watts* 66), the devisee of the defendant, whose land was sold, was held entitled to recover against a purchaser at sheriff's sale, who unfairly made representations on account of which it was alleged he got the land cheaper. In *M'Kennan* v. *Pry,* (6 *Watts* 137), the same point was decided in the same way. In *Hoffman* v. *Strohecker,* (7 *Watts* 86), in ejectment the land was recovered against a sheriff's deed on a regular sale, but on a satisfied judgment, which the purchaser knew was satisfied.

In this case there was fraud in the party plaintiff and purchaser alleged. His levy was as follows: "Levied on all the right, title, interest and claim of the defendant in and to a certain tract of land lying in Union and George township, on which there is erected two log dwelling-houses, two barns, and other out-houses, and apple-orchard, containing 380 acres, more or less, about 250 acres cleared, 30 of which is meadow, adjoining lands of Stephen Mackey, John Hagan, and Nathaniel Ewing, Esq., and others; *subject to the claim which the plaintiff has in and to the same, which plaintiff alleges is 200 acres.*" Now, in a former trial, this claim to 200 acres had been submitted to the court and jury, and the claim of Brownfield had been found to be absolutely nothing, and at this trial was not even brought to the notice of court and jury.

In several of the cases cited, declarations and conduct of the purchaser, whether plaintiff in the judgment or a third person, tending to check the bidding, and get the property at a less price, were left to the jury as evidence of fraud, and found by the jury, with the approbation of the court, to be such fraud as to avoid the sale.

Could any representation by verbal or written notice be so strong as the words of this levy? Add to this the uncertainty as to the title from this Act of Assembly; and there is no case which is so strongly tinctured with fraud. Yet the judge says, "whether the Court of Common Pleas did right in confirming the sale under all the circumstances, (considering the effect of the wording of the levy " subject to the claim of Brownfield to 200 acres" of the

[Braddee v. Brownfield.]

land, and besides the shade cast on the title offered for sale, the uncertainty created by this Act of Assembly,) is not a question open for the decision of this court." But it ought to have been left to the decision of a jury. He had before said, " in this state the reception of the acknowledgment of a sheriff's deed, is a judicial act in the nature of a confirmation of all acts preceding the sale, curing all defects in process or its execution, which the court had power to act upon. Everything which has been done is considered as done by the previous order or subsequent sanction of the court, and cannot afterwards be disaffirmed collaterally."

Before I remark on this, I shall cite one more case, *Cash* v. *Tozer,* (1 *Watts. & Serg.* 519). A very Gore had a judgment against A, B & C. A and B gave a power to C to sell their land; Gore levied on it. C gave an agreement to waive inquisition, (as may be done by a defendant whose land is levied on), and that the land might be sold on the *fieri facias.* It was sold in April. The deed was not made at April Term, nor August Term, nor November Term. It was said this delay was occasioned because the power of attorney to C was not at hand. In December, the property (a steam-mill) was burned down. At January Term the power of attorney was produced, and the deed offered for acknowledgment, and this was opposed by Cash and Webb, who had bid it off. The court, after argument, admitted the deed to acknowledgment, and it was duly acknowledged, and the sheriff Tozer sued for the purchase money. At the trial, the judge, on the authority of Judge Baldwin, decided that the acknowledgment made a final end of the matter. This court unanimously reversed that judgment, and sent the cause back to be tried on all the facts; and in that case it was held the court erred in matter of law, which was peculiarly within their jurisdiction.

But in this case there was no hearing of objections; the court would not listen to Braddee's counsel, because the case was not before them. If the Act was void, the cause was before them, and had never been removed. The cases cited show that this court has always, where facts were disputed, left them to a jury —have taken the acknowledgment of a deed objected to, in order that the matter might be tried in an ejectment. In point of fact, the receiving an acknowledgment is no more the judicial act of the court than taking an acknowledgment of a private deed is the judicial act of a judge or justice. The one and the other attest the execution so that the deed may be recorded by recorder of deeds or prothonotary, and read in court, without other proof of due execution; but leave the one and the other open to every other objection. So the law has been held, and must and will be held, until our whole system is changed, and facts taken from the jury and the power over them assumed by the court; the constitutional provision to the contrary notwithstanding. There does exist in

[Braddee v. Brownfield.]

the minds of some lawyers and judges, an idea that juries are not to be trusted : but they must and will be trusted.   A pretty long and general acquaintance with the administration of justice has raised no unfavourable opinion of them in my mind.   They are an important and essential part of the court.   The attempt to lessen their share in the administration of the laws, if it has any effect, will be to lessen the power, and influence, and usefulness of the judges.

There is another point in *Thompson* v. *Philips*, which I totally deny, viz.; that a sheriff's sale will pass any title where no *fieri facias*, or where a *fieri facias* is levied after the return-day, inquisition and condemnation, without a previous levy on a writ which has been levied.  I thought it was known and not disputed, that no act, whether on mesne or executive process, was of any validity unless done before the return-day of the process.   The inquisition is not the act of the sheriff; he signs it to show that it was done in pursuance of his writ, and that the jury was summoned and sworn by him.   A sale after the return-day of the *venditioni exponas* was tolerated on the fiction of the whole term being one day.

In point of fact, the acknowledgment of a deed by the sheriff is taken without knowing or inquiring whether there was a judgment, or *fieri facias*, or inquisition, or *venditioni exponas*.   The certificate on the docket, or on the deed, does not state or purport any more than that the officer acknowledged the execution of the deed; it does not even amount to a delivery of it.   *Robins* v *Bellas.*

On both points I would reverse the judgment, and order a *venire de novo*.

Judgment affirmed.